Good afternoon, Your Honor, and members of the panel. May it please the Court, my name is Gary Pemberton. With me today is Evan Granowitz. We represent the appellant and the plaintiff in the underlying action, A. Farber & Partners. Before I begin, I'd like to reserve across the five minutes for rebuttal, if I could please. We've burdened the Court with quite a bit of briefing on this, but I think that the analysis here with regard to the standing issue, which is really what should be the primary concern of the Court, can be distilled down to several errors that were made by the District Court that can be gleaned simply by reviewing the District Court's opinion. And this can be found in the record at page 24. The District Court began by conceding, and I'm quoting, plaintiff may be correct, the Damges estate was injured by the monetary transfers to the Garber defense. This was a motion for summary judgment. So what the Court was saying was, there is a tribal issue of fact as to whether Mr. Damges' estate was injured by the transfers. But it is after this that the Court's analysis failed it. Because it then went on to say, plaintiff has not and cannot establish that the injury was by reason of a violation of Section 1962, which is, of course, the RICO statute. Now, the evidence that was before the Court is inconsistent with that finding. Before the Court was evidence, first of all, from Mr. Garber himself, the defendant, whereby he conceded that what he claimed was going on was gambling. Money was being transferred from Canada down to Costa Rica through internet gambling. And the plaintiff had introduced substantial evidence that the type of gambling that was going on was illegal and violated the RICO statute. But one could go further than that. The plaintiff introduced evidence from Mr. Damges himself, his testimony under oath, that he was being extorted by Mr. Garber, and that all that was going on was money laundering. And finally, before the Court, was evidence that was submitted by the plaintiff that indicated after Mr. Damges was arrested, in violation of both Costa Rican and Canadian court orders, Mr. Garber transferred the money out of Costa Rica to locations all over the world, including into the United States, in an effort to launder the funds and hide the money from the receiver. In addition, we introduced evidence before the Court that not only did Mr. Garber launder money, but he also took a number of steps in several countries to block the interim receiver's investigation. So in reading the Court's order, one is puzzled as to how the Court could find that these transfers and the subsequent actions did not violate the RICO statute. It's possibly when you go to the next sentence of the opinion that you can try to understand the Court's reasoning. The Court then writes, the only claims that plaintiff can bring on behalf of Damges' estate are those that could be brought by Damges himself. The Court then goes on to write, but Damges played an active role in these transfers, and therefore the receiver cannot go forward. Now, this finding by the Court was an error both factually and legally. First of all, it was an error factually, because we had put before the District Court substantial evidence that many of Mr. Garber's predicate acts and RICO violations occurred after Mr. Damges was arrested. Indeed, it was after Mr. Damges was arrested that Mr. Garber transferred funds out of Costa Rica and began laundering money and took steps to impede the interim receiver's investigation. And in fact, Mr. Damges could not have participated if indeed his testimony is correct that he was extorted. And that was evidence on a most presumptive judgment that would create a tribal issue as to the gambling itself. But if I understand you correctly, even if the District Judge were right, you're saying that that only implicates the possible defense. It doesn't implicate standoff. Yes, I was going to get to that, Your Honor. That is another issue that the District Court erred on. Even if there was a defense of impari delectable or inequitable conduct by Mr. Damges, we have cited the court to a number of cases that say, this does not go to standing. This is an affirmative defense. It goes to the merits of the case. And since this was a motion for summary judgment, Mr. Garber had the burden of putting on evidence that there was not a tribal issue of fact as to this inequitable conduct. Mr. Garber neither put on such evidence, nor did the coordinate's opinion even address this issue. But the court's finding was also legally incorrect. We have cited the court both to the recent Donnell opinion of this court, as well as to the O'Melveny choosing holdings, all of which stand for the proposition that inequitable conduct, while it may be able to bar the participant's action, cannot run against a receiver, both under federal common law and under California state law. The court cited to an opinion from the state of New York applying New York state law. We did not have an opportunity to argue, as we pointed out in our brief. We didn't have an opportunity to even address this issue. And the court concluded that because we stood in Mr. Damges' shoes, we were precluded from bringing these claims. The court's error then went further in the opinion. When it then came to the conclusion that the Canadian court order did not authorize the receiver to bring this action, because it did not authorize the receiver to litigate claims of the investors against third parties. Now again, as I hope I've made clear, it was never the intent of the receiver to litigate the claims of the investors against Mr. Garber. Well, then you brought a motion to amend the complaint to say that you had the investors' assignments or something to that effect. Do I remember this right? I do not recall if we brought a vote. To be quite honest, Your Honor, I do not recall that. I guess what I'm trying to find out is if we send it back, where do you want us to put you back with the original complaint? Or you made a motion to substitute parties and? No, what we did was we asked the district court, if the court did find, indeed, we believe incorrectly, that the receiver lacked standing, that pursuant to Federal Rule of Procedure 17A, we be allowed sufficient time to have the investors ratify the action, substitute in, or join in the action. That's what I'm getting at. You're not asking for that anymore? No, no. Not at this point. You want us to? We believe the court was incorrect from the get-go by finding that the receiver lacked standing. Returning to my point. I think your lawyer wants to talk to you for a second. If the court were to find that we do not have standing, we would ask for that relief in the alternative. But moving on with the Canadian court order, first of all, the receiver has never been the receiver's intent to litigate the claims of the investors. Again, going back to what we did allege and what we were not alleging, there was no allegation in our complaint that Mr. Garber had committed securities fraud that caused damage to the estate, breach of contract. These are claims that clearly would be held by the investors. The claims that we were alleging down below were claims held by the estate. And again, the Donald opinion is on point on all fours here. Because that opinion stands for the proposition that where it is the corporation through the participation of management that wastes assets through looting, or in this case gambling, or money laundering, those claims do not belong to the individual predators of the estate. They belong to the estate itself. And the Donald opinion, as you know, is following the leading opinion on this coming out of the Seventh Circuit, the Shoals opinion, which came to the same conclusion. Finally, I believe nobody would be more surprised than the Canadian court itself if it were to learn that the district court in California had found that it had not authorized the receiver to prosecute this action. We've explained in our briefs all the evidence that goes to that. But the key for the court is to look at the record pages 270 through 272, where the language appears, where the Canadian court authorizes not only actions such as this one, but this action itself. And by that, I mean it authorizes the receiver to prosecute lawsuits. It defines the property that the receiver is to seek to obtain, the funds that are indirectly related to the proceeds that were transferred by Mr. Damji to Mr. Garber, as well as funds that were transferred by investors to Mr. Garber himself, themselves. And finally, elsewhere in the brief, cite the court to an order where the Canadian court ordered Mr. Garber to return the funds he had received to the receiver. Now, Mr. Garber violated that order. He violated Canadian law. He violated Costa Rican law. He violated court orders. Therefore, we believe, and we ask the court to find that the district court erred in finding that the receiver lacked standing to reverse the district court's holding and to remand this action. Thank you. Thank you very much. Good afternoon, Your Honor. Good afternoon, Your Honor. Good afternoon, members of the panel. May it please the court, I'm Alan Finkel, and I represent the Garber Defendants and the Attellies in this action. Your Honor, the facts in this case were somewhat certainly in dispute, but Mr. Garber introduced evidence before the court that he was a bookie. He was operating a legal business in Costa Rica. He had an opinion of a Costa Rican lawyer that said his business was legal, and he simply accepted wagers from a very bad man in Canada who had scammed some $70 million Canadian from members of his fellow religious order. Mr. Garber didn't do anything wrong. He accepted the bets. Mr. Gamgee lost the bets, and Mr. Garber didn't pay off.  If we ever got to the merits. How does that go to his standing? But in this case, the receiver elected to bring this case as a federal RICO claim. The receivers could have brought this case in some other capacity, as the district court suggested when it remanded the state claims and permitted the receiver to refile the state claims in state court. Or in the alternative, if RICO was truly the best remedy for this class of Canadian investors who were the persons injured by this alleged RICO claim, they had years to bring this claim. Remember, Mr. Gamgee was arrested in Toronto in April of 2002. I'm still not tuning in to how this affects whether he can sue you or not. The receiver had the right under the Canadian receivership order, which was a fairly standard receivership order. It looks a lot like a receivership order you would expect to see out of a California court or a federal court. It allowed the receiver to collect the assets of Gamgee and the so-called Gamgee class action defendants. It did not vest that receiver with the rights that the investors had to recover the investors' own direct claims. And the courts in California, as we pointed out in the brief, the courts, the federal courts in the context of a bankruptcy trustee or a receiver, and the courts, not surprisingly, in Canada, because they're all applying common law, have held in cases dealing with receiverships and trusteeships that in a case such as this, the receiver certainly has the right to collect the assets of the receivership estate. But the receiver does not have the right to assert investor claims. No, but the claim here is, you might as well address it directly, is that your client was money laundering in violation of RICO. Yes, he was. That's the name of the estate. And if a person withstanding had made that claim, then undoubtedly the receiver of this property has the right to make that claim. Because that claim, the claim of injury, the party who was injured by the alleged RICO claim was the investors. There are two types of RICO claims here. There's the original fraud. Forget that for the moment. And then there's the money laundering that harms the estate. And address that. Let me address that. The receiver's estate is damaged by the money laundering. Let me address that. The alleged money laundering that was alleged to have taken place was the conversion of monies obtained fraudulently into Canada into so-called laundered gambling debts. That had all occurred long before the receiver was appointed. And it's important to note. Well, what does that have to do with the price of eggs? Well, there was nothing. It had all occurred before on the property that he's been given jurisdiction to amass. Your Honor, the evidence. I mean, I don't want you to confuse yourself by trying to confuse me. I wish you would focus on this. Why the money laundering claims are not genuine RICO claims of the estate of the receiver. There's two money laundering claims. There's a money laundering claim that occurs prior to the time the receiver is ever appointed. And then there's a reference to that. Well, I'm trying to distinguish that from the money laundering claim that I think the court is asking about, which is the money laundering claim that the receiver claims that the receiver, in his capacity qua receiver, was injured by that money laundering. That's what I want to address. That claim, let's look at that. Whatever money laundering took place, if any, took place before the receiver was appointed. A receiver, the evidence in the record, by the way, and the pleading, your Honor should understand that this concept that the claim that the receiver was bringing was truly the receiver being injured by the money laundering in his capacity as receiver. That was not really raised below. The district court was quite justified in viewing the case as it did. So you're focusing on that now and not tell us it's irrelevant, just to answer the question. Sure. There was the evidence and the way that the plaintiff had pleaded the case is that almost all of the money was supposedly dissipated long before the receiver was appointed, before an order was entered requiring the Garber defendants to turn over the money. And in fact, by the time that order was entered, the vast bulk of the money, less some million and a half dollars, had already been transferred. Now, is that money laundering? Because that's not money laundering under RICO. That's, at worst, a party not obeying a court order, which is enforceable by a court in which the order was entered in Canada, or maybe enforceable by a court in Costa Rica, if they got enforcement in Costa Rica, but not a violation of RICO. That's not a standing argument. That's a merits argument. Excuse me? That's not a standing argument. That's a merits argument. No, your Honor, I think that goes to standing. The question is, does. You said he didn't stand. No, no, no. I apologize. Your Honor is correct. If the receiver could have proved that the RICO violation was against him qua receiver, as opposed to the investors, which was not a claim that he ever pleaded or attempted to prove below, the claim was that it was the investors that were injured. That's the whole $34 million that the receiver was seeking. And that's why the district court was justified in relying on all the law, not just the Wagoner Second Circuit case, but all the law that stands for the proposition that there is a distinction in Canadian law, California law, and federal law, between investors' claims and receivers' claims. The receiver didn't cite one case, either below or on appeal, that stands for the proposition that a receiver, qua receiver, is entitled to assert a RICO claim for someone who didn't obey a court order. And we'll get to a moment about the service of that court order, but someone who didn't obey a court order saying fork over the money in the interim. Why do you think the Canadian court approved the suit? The Canadian court, we pointed this out in the footnote in our brief, Your Honor. The Canadian court, let's remember, the Canadian court gave the receiver the right to collect the assets, including filing suit for the assets. A report was made to the Canadian court by the receiver. It was a sealed report at the time. It's in the record. I believe it's an affidavit of Mr. Cooperman. And he repeats the lawyer's recommendations that say, we think we should sue Mr. Garber in California. It nowhere says we should bring a RICO action. The Canadian court was never apprised of that. It never made any consideration as to what type of relief was proper, whether it be in a federal court, state court, or how it should be handled. They relied on the advice of counsel in California. Counsel elected to bring this as a federal RICO claim when it turned out that this receiver didn't have standing to bring it as a federal RICO claim. Now, counsel could have elected to bring all the other pendent state claims in state court. Maybe the result would have been different. Counsel had the right. The receiver had the right, as Your Honor is aware, after the district court dismissed the federal RICO claims for lack of standing, go ahead and refile in state court. But these people were not left without a remedy. And the answer to Your Honor's question, I think, is that the Canadian court said to the receiver, go off and file a lawsuit like you're permitted to. But it never intended to afford jurisdiction to the receiver apart from the receiver's jurisdiction to collect the estate's assets. In other words, let's look at some of these injured investors. There were people, as we pointed out in our brief, who sent their money directly down to Costa Rica, presumably at Mr. Damagey's instructions. Are those people deprived of the right to bring a claim directly under RICO if that's the right statute by that receivership order? The receiver argues yes. But there's no support in the record for that. All those people had the right, if they wanted to, to bring a RICO action as the injured investor and say, I was injured in my business and property by a violation of the predicate acts. Call it money laundering, call it ambling, call it extortion, whatever it supposedly was. Those folks had standing to bring that claim. They're bringing it now, as a matter of fact, but not as a RICO claim. Can I ask you a question? Sure. Do I understand your position to be that if an estate was robbed, somebody walked away with a million dollars from the estate, and it went into bankruptcy, and then a receiver was appointed, he could not go after that million dollars stolen before he was appointed? No. Because that happened before he was appointed. No, that is not my position. Not at all, Your Honor. How does that differ from what you were told? Because you said the estate was robbed. And that would imply that it is a claim of the estate, like a bankruptcy estate, like in the Hamid case, it was a bank, that the depositors of the bank in the Hamid case, Ninth Circuit case, they didn't have the right to sue the bank robbers, so to speak, the looters. Only the bank had that right. Or in that case, I believe it was a bankruptcy case, the trustee of the bank. But if you said, as in this case, the investors directly made the investment with either Gamgee or directly to Mr. Garber. And each one had a specific amount. We put that in our brief. There was evidence that people invested $18,753 by a wire transfer on a certain day. How could you say that that person didn't have the right to collect his or her own money? And a RICO claim if that was the right kind of claim to bring. And that's the fundamental mistake that we say the receiver is making in this case, and that the district court was quite correct in determining that whatever claims might have existed for the receiver to collect. In other words, suppose Mr. Gamgee had taken the money and bought a car and somebody stole the car. Can the receiver sue to get the car back? Sure. Absolutely. But that is very different from direct claims and direct injury, which is what occurred in this case. Each of those investors, or more properly, to be brought as a class action, could have brought a class action. And Mr. Gamgee was arrested in April of 2002. Mr. Garber was raided down in Costa Rica in August of 2002. He pled guilty in November of 2002. This case was a big story in Canada. And any of those investors had the right, if they thought it was appropriate, go file a class action in a federal district court in Los Angeles and sue Mr. Garber. They would have had standing. And then all these disputed issues that we've been talking about today would have been determined. But the party who didn't have standing to raise the RICO claim, just the RICO claim, that's all the district court ruled on, that party raised that claim. District court quite properly ruled that that party, that receiver, did not have standing to raise that claim. The investors did. And the district court then quite appropriately dismissed, without prejudice, all dependent state claims, which the receiver, if he had the standing to raise those, could easily have done. I would like to talk about Rule 17 substitution, if that's appropriate. The district court disallowed the request for Rule 17 substitution. That's a matter of abuse of discretion. The district court did not abuse its discretion in so doing. There were some 5,000 investors. How was the district court supposed to manage either substitution or ratification? No suggestion was made by the receiver below or on appeal how that would have happened. And the district court was well within its rights and didn't leave these people without an injury. After all, he left them with the possibility that state claims would be maintained. Only thing that the district court said was that the receiver simply didn't have standing to raise federal RICO claims. The receiver was the receiver of DMG and also STS White. Do I understand that correctly? And some other phony entity. There never was an STS White. There was a name. Is it a corporation? I don't believe the record shows that it was ever incorporated. As far as we know, it was a name that Mr. Damji made up in the connection with his fraud. But if I think I hear where you might be going, Your Honor, it wouldn't make a difference if it was a corporation. I mean, this was simply Mr. Damji, an individual, scamming thousands of others, most of them up in Canada, stealing their money on a fraud. And if anyone committed a RICO violation and is entitled to a return of that money under RICO, the district court properly found it was those investors. Thank you, Mr. Frager. Thank you. Mr. Pemberton, you've got about four and a half minutes left. Thank you, Your Honor. If I heard counsel correctly, I believe he conceded that Mr. Garber was laundering money under the RICO statute. That is actionable. By whom? And that is what is before this court. We have cited the court first and foremost to the Hamid opinion, but also the estate of Espirito's opinion, 443 F3rd 1172, also out of this circuit, as well as the Miller opinion out of the second circuit, that's 217 F3rd 74, all stand for the proposition that creditors of an estate lack standing to assert derivative RICO claims on behalf of the estate. So the issue becomes whether these are general claims held by the estate or particularized claims held by the investors. We cited the court to the Henry Folks case, which is a bankruptcy appellate opinion out of this circuit, which goes to great lengths to try to explain the difference. And what it really comes down to is if any creditor could assert the claim, it is a general claim, and therefore it is held by the trustee and the estate. The claims that we are asserting, again, there's not the fraud of Mr. Damji when he was speaking with each investor. It's not the misrepresentations.  It's what happened after he had the money. When he laundered the money, when Mr. Damji testified, he was extorted in sending the money down to Costa Rica. These are general claims. So would you have us hold that the receiver can bring whatever claim Damji could bring? Yes. And as to the issue of his participation, as the court has correctly noted, that's an affirmative defense. That's not a standing issue. And a number of circuits have held so. Just so I'm clear, you're not raising the claims of the investors. You would be content with a ruling from us that says, if you go back to district court, Damji can litigate whatever claims Damji himself could bring, whatever RICO claims he could bring. The general claims that are held by Damji, his estate, his corporations. And remember, there was a statement made that these were sham corporations. Again, it was the burden of the defendant to show that these were sham corporations. There's no evidence of that. The evidence is quite to the contrary. These were corporations. Well, if they show it, they show it. If they don't, they don't. But you're asking simply to be able to assert whatever claims that Damji and the STS company could have brought. Yes. However, what I'm actually asking the court to find, and the parties agree upon this, the trustee's authorization is based upon what the Canadian court provided to it. And so it's a careful reading of the Canadian court order that is a way to determine what the standing or the authorization is of the trustee. You can be authorized to do anything in the world. But if in the United States, you have to be a person injured in your business or property, it doesn't matter what the Canadian court authorized, you still have to be a person injured in your business or property. Correct. The problem is the judge below ruled that you weren't injured in your business or property. And that's why I'm asking, if you are going to go back and say, Damji can bring whatever RICO claims he has, the receiver stands in his shoes, I follow you. Well, certainly the- They can't expand RICO standing in Canada. I agree. The Canadian court could not expand RICO standing. However, the federal court is to look to the Canadian court order to determine what the scope is of the trustee's authority to bring this action. Thank you very much, Mr. Binkle. Thank you as well.  Thank you, Your Honor. Thank you, gentlemen.
judges: Noonan, Silverman, Conlon